IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 22-6** |
| **MYRNA ORTIZ** | : | |

## ORDER

AND NOW, this _____ day of _____, 2023, upon consideration of the government's motion, and any response, it is ORDERED that, for the reasons set forth in the government's motion, the government's motion *in limine* to preclude expert testimony from Jeffrey T. Hancock is hereby GRANTED.


BY THE COURT:


_____
TIMOTHY J. SAVAGE
*Judge, United States District Court*

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 22-6 |
| MYRNA ORTIZ | : | |

### GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE EXPERT OPINION TESTIMONY OF JEFFREY T. HANCOCK

The United States of America, through its attorneys, Jacqueline C. Romero, United States

Attorney, and Megan Curran, Special Assistant United States Attorney, submits its motion *in*

*limine* to preclude expert testimony offered by the defendant from Jeffrey T. Hancock, a

proposed expert in the psychology of social media.

As explained below, the proposed testimony does not meet the standard set forth in

Federal Rules of Evidence 401, 702 and 703, and in *Daubert v. Merrell Dow Pharmaceuticals,*

*Inc.*, 509 U.S. 579 (1993). The proposed testimony is further impermissible under Rule 704(b)

of the Federal Rules of Evidence, because it purports to state "an opinion about whether the

defendant did or did not have a mental state or condition that constitutes an element of the crime

charged," which is a question reserved for the jury alone. Fed. R. Evid. 704(b). The proposed

testimony is also impermissible as the result of inadmissible hearsay under 804 and opines on

law enforcement practice and policy in violation of the Supreme Court's holding in *Wayte v.*

*United States*, 470 U.S. 598, 607–08 (1985). For all of these reasons, Hancock's testimony

should be excluded.

### I.    THE INDICTMENT

On January 11, 2022, a grand jury sitting in this district returned a thirty-two-count

indictment charging defendant Myrna Ortiz with one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), and thirty-one counts of theft of government funds, in violation of 18 U.S.C. § 641. All of these charges arise from Ortiz's participation in a conspiracy to launder funds, specifically Social Security Administration ("SSA") Retirement Benefits and Pandemic Unemployment Assistance ("PUA") funds from November 2017 through October 2020.

## II.    FACTUAL BACKGROUND

The evidence at trial will show that at some point prior to November 2017, an unidentified co-conspirator befriended defendant Myrna Ortiz through an online dating website, www.match.com. Through this relationship, Ortiz communicated through email and text messages with an individual she knew as "Christian Dasilva." Together, Ortiz and Dasilva conspired to launder large amounts of obviously stolen government money designated to support elderly retirees and others, specifically SSA Retirement Benefit Funds and PUA benefits issued in connection with the COVID-19 pandemic.

Starting around November 2017, Ortiz opened numerous bank accounts in her name at various financial institutions, including Citizens Bank, Bank of America, Santander Bank, Citibank, Ally Bank and PNC Bank. On each of the bank accounts she opened, Ortiz was the sole signatory. After Ortiz opened these accounts, she began receiving electronic transfers of stolen SSA Retirement Benefit payments that were in the names of many different persons who had not applied for retirement benefits.[1] The descriptions of the transactions as reflected on the bank statements often stated the purpose of the funds and/or contained identifying information of

---

[1]    The SSA funds that Ortiz illegally obtained were sent by wire from SSA payment centers to the Department of Treasury in Kansas City, Missouri, to the Federal Reserve Bank in East Rutherford, New Jersey, and ultimately, to Ortiz's bank accounts.

victims, for example: "ACH Electronic Credit Social Security for D.J.S. $2,327" (Citibank bank statements), or "XXSSA Treas 310XX SOC SEC $2,411" (Santander Bank statements).

From the evidence, it does not appear that Ortiz filed the fraudulent applications for SSA Retirement Benefits herself. Rather, an unknown co-conspirator, or co-conspirators, used SSA's online portal to file fraudulent online applications or "iclaims" for Retirement Benefits from SSA. These iclaims purported to be filed on behalf of numerous persons, none of whom had applied to SSA for retirement benefits. The fraudulent applications contained personal identifying information ("PII") of the victims, including their names, their dates of birth, and their social security numbers. Because SSA was unaware of the fraudulent nature of these applications, SSA awarded retirement benefits based on the applications filed by the co-conspirator or co-conspirators, in the names of at least thirty-two separate fraud victims of this conspiracy.

The fraudulent applications directed the funds to various bank accounts, including bank accounts opened and controlled by Ortiz. Often, Ortiz would open new bank accounts every few months, after which, new electronic transfers of funds would be wired into Ortiz's accounts in the names of the new and additional fraud victims. Eventually, during her participation in the conspiracy, Ortiz opened 13 different bank accounts through which she laundered the proceeds of the fraud.

In addition to the SSA funds obtained by fraud, in 2020 Ortiz began receiving – in the multiple bank accounts that she had opened and over which she exerted sole control -- pandemic unemployment assistance funds, from the states of Illinois, Indiana, West Virginia, Arizona, Pennsylvania, and Ohio. Like the SSA benefits obtained by fraud, the descriptions of the PUA funds transactions on Ortiz's bank statements often clearly stated the purpose of the funds and/or

contained identifying information of victims. As with the SSA funds, there is no evidence that Ortiz completed the fraudulent applications herself. Instead, an unidentified co-conspirator or co-conspirators filed the fraudulent applications for these PUA funds online, through the portals that various states set up to permit application for such benefits. Like the fraudulent SSA retirement benefits applications, the fraudulent PUA applications utilized the PII of the victims, including their names, dates of birth, and social security numbers. Because the states administering the PUA emergency benefits were unaware of the fraudulent nature of these applications, they awarded PUA benefits in the names of the fraud victims, and, based on the fraudulent applications, directed the funds to bank accounts established and controlled by defendant Ortiz.

From in or about November 2017 to in or about October 2020, through the thirteen different bank accounts Ortiz opened in connection with this scheme, she received over 296 electronic deposits of government benefit funds in the total amount of approximately $688,049.20.

Defendant Ortiz primarily laundered these government funds obtained by fraud, by going to ATM machines over 785 times, to withdraw the funds in cash at ATM terminals. With that cash, Ortiz purchased gift cards, usually in $500 denominations. Ortiz then generally transmitted the gift card numbers and/or the images of those gift cards to a person whom she believed was Dasilva.

But Ortiz did not send all of the fraud proceeds to Dasilva. Ortiz financially benefitted from her participation in the money laundering conspiracy by using funds obtained by fraud to pay her personal expenses. For example, financial analysis shows that, during the conspiracy, Ortiz spent approximately $80,000 in debit purchases with the debit cards associated with her bank accounts, into which the fraud proceeds had been deposited. Ortiz spent these funds on

personal expenses through merchants including Amazon, Comcast, T-Mobile, 7-11, Honeylove.com., Walmart, local nail salons, and grocery stores in Philadelphia. Ortiz also transferred funds through a cash app to her daughter. In addition, during the execution of the federal warrant to search her home, agents found, under her mattress, numerous gift cards, including for such retailers as Victoria's Secret, Old Navy, Target, Walmart and Santucci's Pizza, a local Philadelphia pizza shop. Determining the extent to which Ortiz profited from her activities during the conspiracy is complicated by her having made over $275,000 in cash withdrawals from the 13 bank accounts, and having spent over $300,000 at Walgreens and Rite Aid; presumably some, if not most of these funds, may have been utilized by Ortiz to purchase additional gift cards to launder the funds to the co-conspirator, Dasilva. However, defendant Ortiz clearly profited from her involvement in the money laundering conspiracy, as evidenced by her use of the debit cards and debit card purchases in Philadelphia. She was paid to perform this activity.

## III.    DEFENDANT'S EXPERT DISCLOSURE

On February 6, 2023, the defense provided notice of expert Jeffrey T. Hancock by providing government counsel with his report. Defendant proffers Jeffrey Hancock, as a "leading expert on the psychology of social media." Hancock's report is attached as Exhibit A. According to Hancock's report, the defense seeks to have Hancock give expert testimony at trial on the following topics:

1.  the prevalence and history of online romance scams

2.  federal law enforcement initiatives to combat romance scams and assist victims

3.  criminal enterprises operating behind these scams

4.  characteristics of a typical romance scam and scam victim

5. assessment of Myrna Ortiz victimization and role in a romance scam

6. assessment of Myrna Ortiz's ongoing role in the romance scam

A close reading of Hancock's report reveals that such testimony is not admissible and would be unhelpful in any event, including because (1) to the extent it concerns this particular case, it is not relevant or reliable, based on the scant information upon which it purports to be based, that is, almost exclusively on Ortiz's own self-serving statements, which contradict other evidence in the case; (2) it is an end-run around the hearsay rules; (3) it improperly comments on law enforcement policy; and (4) it improperly opines on the ultimate issue of whether Ortiz had the requisite mental state or condition constituting an element of the crime charged. The Court should preclude this proposed expert from testifying to the above, under Federal Rules of Evidence 401, 403, 702, 703, 704, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

## IV.   ARGUMENT

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert opinion testimony in federal criminal trials. The rule states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 104(a), meanwhile, assigns to a trial judge the role of being a gatekeeper for the admissibility of expert witness testimony. *Daubert*, 509 U.S. at 592 and n.10. *See also Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 141, 147 (1999) (extending *Daubert* to cases where the expert testimony is not based on "scientific" knowledge); *In re Zoloft (Sertraline Hydrocholoride) Prods. Liab. Litig.*, 858 F.3d 787, 792 (3d Cir. 2017) ("In general, courts serve as gatekeepers for expert witness testimony."). Together, Rules 104(a) and 702 impose a special obligation upon the trial judge to ensure that all expert testimony "is not only relevant, but reliable." *Kumho Tire*, 526 U.S. at 147 (quoting *Daubert*, 509 U.S. at 589).

"Expert testimony is deemed to assist the trier of fact to understand or determine a fact in issue where 'the expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *Rooney v. City of Phila.*, 623 F. Supp. 2d 644, 661 (E.D. Pa. 2009) (quoting *Daubert*, 509 U.S. at 590). "The consideration has been aptly described ... as one of 'fit.'" *Id.* Although *Daubert* listed numerous factors that judges may consider when exercising their gatekeeping functions, the Court in *Kumho Tire* held that this list "would often be of little use in evaluating non-scientific expert testimony." 526 U.S. at 141, *cited in United States v. Davis*, 397 F.3d 173, 178 (3d Cir. 2005). "Under *Daubert*, a trial court must evaluate such testimony and make sure it 'rests on a reliable foundation and is relevant to the task at hand.'" *Davis*, 397 F.3d at 178 (quoting *Daubert*, 509 U.S. at 597).

Among the factors that a trial court may consider when performing its *Daubert* gatekeeping function are the qualifications of the expert. *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 152 (3d Cir. 1999). Sometimes, a witness may be qualified to render expert opinions about some topics but not others. *See, e.g.*, *Soufflas v. Zimmer, Inc.*, 474 F. Supp. 2d 737, 743-44 (E.D. Pa. 2007) (finding that an organic chemist was qualified to testify about the chemical effects of

certain sterilization processes on a medical device, but not qualified to opine about any manufacturing defect in the device, any alleged inadequacies in a doctor's warnings about the device, or the customary practices of manufacturers of medical devices).

The rationale for the District Court's function when assessing the relevancy and reliability of expert testimony was explained by the Supreme Court in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999.) The objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Id*. at 152. The *Kumho Tire* Court held that *Daubert's* "gatekeeping" obligation applies not only to "scientific" testimony, but to all expert testimony covered by Federal Rule of Evidence 702. *Kumho Tire*, at 147-149. In *Kumho Tire*, the Supreme Court held that Rule 702 "requires a valid...connection to the pertinent inquiry as a precondition to admissibility." *Id*. at 149, quoting Daubert at 592. "And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question... the trial judge must determine whether the testimony has, 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Id*. (citations omitted).

### A. Hancock's Testimony Should be Precluded as Not Relevant and Not Reliable under Fed. R. Evid. 401, 702(b) and 703.

#### 1. The testimony is not relevant.

The defense's proposed expert is seeking to testify generally, to the "prevalence and history of online romance schemes" as well as testify specifically to defendant Ortiz, that "Ortiz remained a victim throughout her involvement in the romance scam," and her "inability to detect red flags in the romance scam is reasonable given 1) the criminal's emotional and psychological

8

manipulation of Ortiz and Ortiz's unique 2) psychological vulnerabilities and 3) cognitive

deficits"—making it likely Ortiz was "unaware that she was engaging in criminal activity," but

instead "she believed her actions to be necessary to maintain her relationship with the scammer."

These opinions are not relevant under Federal Rule of Evidence 401, which defines "relevant"

evidence as evidence as "evidence tending to make a fact of consequence more probable or less

probable." It is not a "fact of consequence" that Ortiz engaged in an online relationship with

Dasilva, and Ortiz developed strong romantic feelings for Dasilva before the criminal acts

ensued. Both sides agree on this, and the government plans to present this evidence in its case in

chief.

Concerning the more general expert testimony proffered by the defense on the operation

of romance scams, there is an insufficient factual basis in this case to support such testimony,

even assuming (which the government does not concede) that (1) it is a proper subject for expert

testimony, and (2) Hancock is qualified to give such testimony. This is because, as defendant

Ortiz admitted to law enforcement, Ortiz deleted almost all text messages between her and her

ex-paramour. All we have to rely upon for the claim that Ortiz was a victim of a romance scam is

her own self-serving hearsay statements (this separate basis for exclusion is addressed below, pp.

13-16).

The jury does not need an expert to explain what the facts *do* show, which the

government does not dispute and any lay person can understand: that people in romantic

relationships will go to great lengths to please their romantic interests and foster those

relationships. Such an obvious fact is not at issue in this trial. Instead, at trial the jury will

determine whether Ortiz, acting knowingly, agreed with another person to launder fraud

proceeds, set up bank accounts in order to do so, and then laundered the SSA funds and PUA

funds that were wire transferred into her accounts. It will further determine whether she stole government funds, and converted government benefit funds for her own use—which require the government to prove, again, that Ortiz acted knowingly. There is nothing in Hancock's report to show how he can offer any meaningful assistance to the jury from his expert testimony about an issue in controversy concerning whether Ortiz acted knowingly, or any viable defenses.

Further, the history and prevalence of online romance schemes is not relevant to the actions of defendant Ortiz. As defense's expert proposes in Part I, Section 1 of his report, he would seek to testify as to how scammers have evolved over time and the prevalence of online scammers. Ex A., page 3-5. As with the other more general testimony, neither of these subjects offer evidence relevant to the issue of knowledge; instead, they appear to be attempts to evoke understandable but irrelevant sympathy for Ortiz. They should be precluded.

>        2.    **The testimony is not reliable because it does not "fit" (i.e., address) the issue of knowledge.**

Further, Rule 702(a) allows for expert testimony if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Courts have broad discretion to exclude opinions that do not address the correct issue as defined by applicable law. It is an abuse of discretion not to exclude expert testimony when it doesn't "fit." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 831, 835 (3d Cir. 2020); *see Daubert*, 509 U.S. at 579 (expert opinion evidence must assist the trier of fact).

Hancock relies upon the findings of Gillian Blair, Ph.D., the proffered psychological expert, to conclude that Ortiz suffers from supposed mental abnormalities. The Court should exclude Hancock's opinions because, as explained in greater detail in the Government's motion *in limine* to exclude Blair's psychological testimony, evidence of supposed mental abnormality is

admissible only when it would support a legally acceptable theory of lack of *mens rea*. *United States v. Pohlot*, 827 F.2d 889, 904 (3d Cir. 1987) (admissible expert opinions regarding mental state are limited to those that, "if believed, [] would support a legally acceptable theory of lack of *mens rea*"). Hancock's second-hand opinions do not do that, and his report fails to draw any sort of causal link between his conclusions and a lack of *mens rea*.

If Hancock's testimony were allowed, he would tell the jury that Ortiz was prevented from knowing that the funds she was transferring were fraud proceeds, by Dasilva's purported manipulation of Ortiz's emotions, rapport with her, and efforts to isolate her, coupled with Ortiz's alleged cognitive "deficits." So framed, Hancock's opinions must be excluded under *Pohlot*, 827 F.2d at 904. That is because *Pohlot* and its progeny hold that such diminished capacity cannot negate willful *mens rea*, which is satisfied "by any showing of purposeful activity, regardless of its psychological origins." *Pohlot*, 827 F.2d at 904 (emphasis added). Actions driven by pleasing a romantic partner may demonstrate a "lack of self-reflection" or poor judgment, but that is completely different from a "lack of intent," and not a proper subject for admissible expert testimony. *Id*. at 906.

The *Pohlot* rule is straightforward: Expert opinion that a defendant did not "fully appreciate[e] the consequences of [her] acts" is not admissible to negate specific intent, because "purposeful activity is all the law requires." *Id.* at 907. To be admissible, mental health testimony must negate intent, not excuse or justify irrational, but intentional, conduct. The latter effectively amounts to an improper diminished capacity defense. *Id.* Here, the government must prove only that Ortiz acted knowingly: that when Ortiz was opening bank accounts, accepting nearly $690,000 from government agencies to be deposited into those accounts, payable to persons who were not her and not Dasilva, and then transferring the funds to Dasilva, she knew that the funds

11

were proceeds of some sort of fraud. Hancock's "expert" testimony on the issue of Ortiz's

emotional and mental issues should be excluded in its entirety, as it is precisely the kind of

justification testimony that *Pohlot* prohibits. Moreover, Hancock's opinion leaves unexplained a

number of other facts: Ortiz's having been put on notice by Ally Bank in June 2020 that she was

engaged in fraud; her continuation of the fraud after that; and her admissions to law enforcement

that she suspected in early 2020 that the funds were fraud proceeds. That adds unreliability to the

list of reasons to exclude Hancock's testimony. See *In re Zoloft (Sertraline Hydrochloride)*

*Prods. Liab. Litig.*, 858 F.3d 787, 300 (3d Cir. 2017) (district court must ensure expert testimony

given to the jury is reliable and more informative than confusing; unexplained inconsistencies

within opinions render them neither).

### B. Hancock's Testimony Should be Precluded as Inadmissible Hearsay and Runs Afoul of Rules 703 and 804, F.R.E.

Federal Rule of Evidence 702 states that an expert witness's testimony must be "based on

sufficient facts or data," and "the testimony is the product of reliable principles and methods."

Hancock's report fails on both counts. As noted in his expert disclosure, Hancock's conclusions

are based on his single interview of Ortiz, and Ortiz's psychological report prepared by another

expert, Dr. Blair. Both experts rely almost exclusively on Ortiz's own self-serving, hearsay

statements. There are several problems with Hancock's approach.

First, Hancock's opinion is not "based on sufficient facts or data" under Rule 702(b) or

the "product of reliable principles and methods" under Rule 702(c). For instance, Hancock failed

to consider the numerous communications between Ortiz and Dasilva from 2017 until 2020.[2] As

---

[2]     Notably, Hancock has been precluded from testifying as an expert in federal court based
on considerations similar to those raised in this motion *in limine*. In August 2021, the Honorable
Brian C. Wimes precluded Hancock from testifying under *Daubert* and Rules 702 and 703,
F.R.E., in an enticement case where Hancock actually reviewed the chats or communications

Ortiz admitted, she destroyed all text messages between her and her ex-paramour. In writing his report, Hancock also failed to consider the limited number of communications that the government was able to recover. For example, the government provided in discovery a text that Ortiz sent Dasilva on the day law enforcement executed a search warrant at Ortiz's house. In this text, Ortiz appears to tip off Dasilva about the involvement of law enforcement. This is not the conduct of someone with cognitive deficits who is in love; instead, it demonstrates coordination with a co-conspirator and consciousness of guilt. With the limited communications recovered, any expert is precluded from being able to objectively analyze the true nature of Ortiz's relationship with Dasilva as it happened in real time. As Hancock appears to have reviewed no communications (either because Ortiz deleted them, the defense never provided them to Hancock, or he chose to ignore their significance in his report), he did not have sufficient facts or data to produce an opinion that was the product of reliable principles and methods.

Similarly, Hancock's report does not acknowledge—or perhaps the defense chose not to provide him with—statements Ortiz made to law enforcement demonstrating her knowledge that she was laundering stolen government funds, along with her not insignificant sophistication in committing those crimes. Those statements include her first interview with law enforcement and her own handwritten statement. (See Exhibit B, Defendant's Statements). From Hancock's report, it appears that Hancock did not review Ortiz's statements, for instance Ortiz's handwritten statement, in which she stated, "I understand what I did was wrong and take full responsibility for what I've done." (Ex. B, defendant's written statement), or the case agent's report of his interview with Ortiz, which states that:

---

related to the charged crimes. *See United States v. Darren Wade Lasley*, 2:17-CR-04045 (W.D.Mo.), D.D.E. 125.

[Ortiz] suspected something was wrong in 2020 when she noticed the deposits into the account were in the names of other individuals and not Dasilva. She acknowledged she asked him about the deposits and he wouldn't answer her and that she knew what she did was wrong. *Id.*

Second, as described above, Hancock's report is not grounded as a proper application of expert testimony that is helpful to the jury under Rules 702 and 703. Instead, Hancock's testimony amounts to little more than an effort to circumvent the rules of evidence by allowing Hancock to testify based on what Ortiz *told him*. Hancock's summarizing of information from a hearsay source makes him not an expert, but rather a summary witness introducing the content of out of court statements to provide its truth. This evidence is hearsay pursuant to Federal Rule of Evidence 804, as an out of court statement offered for the truth of the matter asserted.[3] If Hancock were permitted to testify, he would effectively be testifying on behalf of the defendant, without her being subject to cross-examination. Rule 703 "was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witness on whose statements or opinions the expert purports to base his opinion." *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005).

This is inadmissible hearsay and does not fall under any exceptions. Rule 703 does not allow for the admission of hearsay under the pretense that is the foundation of the expert's opinion.

In *United States v. Gilmore*, a panel of the Third Circuit upheld the district court's preclusion of an expert who would have opined that defendant had a "hoarding disorder," which

---

[3] While there is an exception under Federal Rule of Evidence 803(4), when the statement is for the purpose of medical diagnosis, that exception does not apply to a hired expert in anticipation of litigation, as is the case here. *United States v. Renville*, 779 F.2d 430,436 (8th Cir. 1985).

"overwhelmed his good judgment," when that conclusion could not negate the specific intent required to commit the crimes, would confuse the relevant issues, and would introduce substantial inadmissible hearsay. 837 F. App'x 101, 104 (3d Cir. 2020)(unpublished). The panel, like the district court, concluded that the expert's testimony was "largely a conduit for hearsay [as it contained] more of Gilmore's would-be testimony than [expert] opinion . . . as if the tail wags the dog." *Id.* (citing *Pohlot*, 827 F.2d at 889). The situation is the same here. Ortiz is trying to introduce her own justification testimony -- that she fell in love in a fake relationship and it so clouded her judgment she did not commit any crimes -- without being subject to cross-examination. This type of so-called "expert" testimony is improper and should be excluded. *Pohlot*, 827 F.2d at 889.

### C.    The Proffered Testimony in Part I, Section 2 Should be Precluded Under Rule 703 and Supreme Court Law.

Hancock should also be precluded from testifying to any of his "opinions" or statements in his expert disclosure as cited in Part I. 2. "Federal Law enforcement initiatives to combat romance scams and assist victims." Ex. A, page 5-6. In this section of his expert disclosure, Hancock lists a number of law enforcement agencies and publications on their websites related to romance scams. As his sources, he listed public websites from the FBI, Department of Justice and Federal Trade Commission, United States Postal Inspection Service, and Financial Crimes Enforcement Network. According to his *curriculum vitae*, Hancock does not work and has never worked for any of these listed agencies. He does not have "personal knowledge" of these agencies' policies, any more than any other person who has read the websites and publications prepared by the various government agencies. He has never investigated or prosecuted any of these crimes or been a part of agencies making these internal policies or decisions.

Hancock cannot be an "expert" on law enforcement practice as he does not appear to

have served in that capacity and is unqualified.

Further, this proposed testimony, which is nothing but Hancock's personal opinions concerning documents provided on websites about law enforcement initiatives involving money mules, has no relevance whatsoever to the issue of whether or not Ortiz participated in a money laundering conspiracy. It appears to be an attempt to raise a selective prosecution argument, through an expert, which is not the appropriate forum and not for the jury's purview, as the Supreme Court has explicitly held.

As the Supreme Court explained in *Wayte v. United States*, absent a violation of constitutional dimension, the government's law enforcement decisions and prosecutorial priorities are not subject to judicial review and certainly are not within the proper purview of the jury. *Wayte v. United States*, 470 U.S. 598, 607–08 (1985). In our criminal justice system, the government retains "broad discretion" as to whom to prosecute. *Id.* citing *United States v. Goodwin,* 457 U.S. 368, 380, n. 11 (1982); accord, *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 248 (1980). "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes,* 434 U.S. 357, 364 (1978). This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the government's enforcement priorities, and the case's relationship to the government's overall enforcement plan, are not readily susceptible to the kind of analysis that the courts are competent to undertake. Judicial supervision in this area, moreover, entails systemic costs of particular concern. Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's

motives and decision-making to outside inquiry, and may undermine prosecutorial effectiveness by revealing the government's enforcement policy. *Wayte*, at 609. Accordingly, evidence concerning the exercise of law enforcement and prosecutorial discretion as a policy matter is simply not an appropriate subject for this trial and must be excluded.

Further, Hancock does not even cite to the initiatives of the two law enforcement agencies who investigated defendant Ortiz for her crimes, the Office of Inspector Generals for the Social Security Administration ("SSA-OIG") and the U.S. Department of Labor ("USDOL"). Thus, even accepted on the expert's own terms, this argument fails. Similarly, what Hancock fails to cite, and further evidences that any testimony by him on this subject would mislead the jury, is that the romance fraud scams typically referenced by the agencies in the initiatives he cites, involve the victim's personal funds or bank fraud and other fraud proceeds, *not* the proceeds of fraud against the government, as are involved here. Both the SSA and USDOL are tasked with stopping the laundering of fraudulently obtained government benefit funds and are actively prosecuting persons like Ortiz who are engaged in laundering these funds. By citing to initiatives by agencies not involved in the current prosecution, Hancock further demonstrates that he cannot be an "expert" on this subject area. For these reasons, the Court should preclude Hancock from testifying about any of the content of pages 5-6 of his report.

**D.    The Proffered Testimony in Part II, Section 2 Should be Precluded under Fed R. Evid. 704(b) because Hancock Purports to Opine on Defendant's State of Mind.**

In his report, Hancock opines on Ortiz's state of mind, stating, "[b]ased on my analysis, Ortiz was most likely unaware that she was engaging in criminal activity and that she believed her actions to be necessary to maintain her relationship with the scammer." Ex A., p. 16. This type of expert opinion is specifically inadmissible under Fed R. Evid. 704(b).

17

Under Rule 704(b), "[n]o expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether [Ortiz] did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto." *See United States v. Watson*, 260 F.3d 301, 308 (3d Cir. 2001). The Third Circuit has explained that "expert testimony is admissible if it merely 'support[s] an inference or conclusion that the defendant did or did not have the requisite *mens rea*, so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony.'" *United States v. Bennett*, 161 F.3d 171, 183 (3d Cir. 1998) (quoting *United States v. Morales*, 108 F.3d 1031, 1038 (9th Cir. 1997)).

Hancock's testimony tries to do much more than what Third Circuit law permits, as he would offer an ultimate conclusion that Ortiz did not act knowingly, which is the "ultimate issue" in the case, in violation of Federal Rule of Evidence 704(b). Expert testimony that purports to tell the jury how to resolve this factual dispute does not "help the trier of fact to understand the evidence or to determine a fact in issue" Fed R. Evid. 702, but instead usurps the jury's function by dictating a particular outcome. As such, Hancock cannot be permitted to testify to this conclusion. *See Bennett*, 161 F.3d at 183; *see also Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) ("Although Federal Rule of Evidence 704 permits an expert witness to give expert testimony that 'embraces an ultimate issue to be decided by the trier of fact,' an expert witness is prohibited from rendering a legal opinion."). Hancock's opinion that it is likely that Ortiz may not have known she was engaging in criminal activity breaches impermissibly on the ultimate fact for which the jury is to consider—putting aside the fact that the opinion is not consistent with evidence that Hancock did not consider in his report. Hancock

18

attempts to opine that Ortiz did not have had the state of mind to commit the crimes charged, which is impermissible. It is the jury's sole role to determine if Ortiz committed the crimes as charged in the indictment. This type of expert testimony is not permitted and should be excluded by the Court.

## V.    **CONCLUSION**

For all of the reasons above, the government respectfully submits that its motion *in limine* to preclude the expert opinion testimony of Jeffrey Hancock should be granted, or in the alternative, a hearing should be held before trial on this issue. The government also reserves its right to raise objections to the proffered testimony at the time of trial.

Respectfully submitted,

JACQUELINE C. ROMERO
United States Attorney

MEGAN CURRAN
Special Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the within Government's Motions

*in Limine* to Preclude Expert Opinion Testimony of Jeffrey T. Hancock, has been served by me

this date, by email and electronic filing upon the following:

Katrina Young, Esquire
Catherine Henry, Esquire
Assistant Federal Defenders
Defender Association of Philadelphia
The Curtis Center Building
601 Walnut Street – Suite 540 West
Independence Square West
Philadelphia, PA 19106


MEGAN CURRAN
Special Assistant United States Attorney


DATED: March 30, 2023

Exhibit A

# EXPERT REPORT OF
# PROFESSOR JEFFREY HANCOCK

REPORT PREPARED FOR:

## FEDERAL COMMUNITY DEFENDER OFFICE FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SUITE 540 WEST
THE CURTIS 601 WALNUT STREET
PHILADELPHIA, PA 19106

Attorneys for Defendant Myrna Ortiz

PREPARED BY:
Jeffrey Hancock
Harry and Norman Chandler Professor of Communication, Stanford University
Founding Director, Stanford Social Media Lab
Department of Communication
Building 120, Room 110
450 Jane Stanford Way
Stanford University
Stanford, CA 94305-2050

## I.    QUALIFICATIONS

I am the Harry and Norman Chandler Professor of Communication at Stanford University and the Founding Director of the Stanford Social Media Lab. I am the co-Director of the Stanford Cyber-Policy Center and the Faculty Director of the Stanford Internet Observatory. I am the co-Founding Editor of the Journal for Trust and Safety.

My primary research areas include examining the psychological dynamics of social media, relationships, language use and communication. I conduct research on how deception and trust operate on the Internet, and on how people understand language, interpret meaning and engage in sense-making in technologically-mediated online communications while forming relationships.  My qualifications and experience are further detailed in my *curriculum vitae* attached as Exhibit "A," which also includes an abbreviated list of relevant publications I have authored or co-authored in the past 10 years.   My experience as an expert witness over the past four years is summarized in the document attached as Exhibit "B."

My research program for the last 20 years (13 years at Cornell University, seven years at Stanford University) has focused on examining social interactions mediated by information and communication technology, especially around topics concerning deception, trust, well-being, relationships (e.g., online dating) and social cognition. I have produced over 100 peer-reviewed scientific papers and am considered a leading expert on the psychology of social media. In general, my theoretical approach draws on media effects research, pragmatics and discourse processing, relationships and issues of trust and safety online. My research has examined a number of cognitive and social psychological factors affected by online communication, such as impression formation and management, relationships, cybersecurity, and individual differences (e.g., cognitive flexibility, personality traits, etc). Within each of these areas my research tends to

2

be guided by more specific, phenomena-related theory (e.g., for deception, the interpersonal deception theory; for relationship dynamics the Hyperpersonal model, etc.).

## II.    MY TASK AND OPINION

I have been retained by counsel for Defendants to offer my expert opinion on the operation of online romance scams (PART I), including their prevalence and history, how law enforcement has addressed and combatted romance scams and supported their victims, the nature of the criminal organizations that operate these scams, as well as the profile of a typical scam and the characteristics of victims. I was also asked to offer my expert opinion on the case of Myrna Ortiz (PART II), focusing on how she became a victim in a romance scam and how and why she continued within that relationship. Below I outline the primary tasks and my responses.

## PART I

### 1. Prevalence and history of online romance scams

A romance scam is a type of fraud that involves using fake romantic relationships to manipulate individuals into giving money, personal information, or both. These scams often occur online through dating websites, social media platforms, or through unsolicited emails. The use of romance scams as a form of financial fraud dates back to at least the 1990s with the rise of internet usage and online dating. However, the tactics and techniques used by scammers have evolved over time, becoming more sophisticated and harder to detect. Criminals using romance scams target people who are lonely or seeking companionship. Psychologically these individuals may be more trusting and are more susceptible to the false promises and affection offered by scammers. Nonetheless, victims of romance scams come from all walks of life, regardless of

education level, type of employment, gender, intelligence, personality or age. While older adults tend to be targeted more because of their relative wealth, it is striking how varied the backgrounds of victims of romance scams are, spanning nearly all demographic categories in the US.

Given how many people are potentially vulnerable to romance scams they are increasingly common in the US and can have serious financial and psychological consequences for victims. In the US, victims of romance scams lost $547 million in 2021, according to data from the Federal Trade Commission (FTC, 2022), which represented an 80% increase from 2020. The total reported lost over the past five years has now reached $1.3 billion, which is larger than any other FTC fraud category. Additionally, victims may also suffer from emotional trauma and psychological damage as a result of the scam. With the social isolation of the COVID19 lockdowns in 2020 numerous Federal agencies warned about increasing romance scams targeting individuals that were isolated at home (e.g., St. Louis Consumer Fraud Task Force).

It is important to note that romance scams can take many different forms and can be highly sophisticated, with the scammers using various techniques to build trust and conceal their true motives. There are, however, several key criteria of a romance scam (Whitty, 2015):

**False identity**: The scammer creates a fake online profile, often using stolen or manipulated photos and information, and poses as a romantic interest.

**Building a relationship**: The scammer builds a relationship with the victim, typically through online communication such as emails, instant messaging, or dating websites. The scammer may express love and affection towards the victim, and may even send gifts or make plans to meet in person.

**Requests for money**: The scammer may eventually ask the victim for money, often claiming to need funds for an emergency or other urgent situation. The scammer may also ask the victim to transfer money or assets on their behalf, or to use their own bank account to receive and transfer funds.

**Disappearance**: The scammer may suddenly disappear or break off contact with the victim once they have obtained the money or assets they were seeking.

**No physical relationship**: The scammer and victim have not met in person or have limited in-person contact, despite having a seemingly established romantic relationship.

2.  **Federal law enforcement initiatives to combat romance scams and assist victims**

Law enforcement agencies have committed substantial resources to combat romance scams and to support and assist victims. These include the following:

i)    *The Internet Crime Complaint Center (IC3):* Established by the Federal Bureau of Investigation (FBI), IC3 is a clearinghouse for victims to report internet crimes, including romance scams, and receive assistance from law enforcement agencies.

ii)   *Elder Fraud Hotline*: A joint initiative of the Department of Justice and the Federal Trade Commission (FTC) to provide resources and support to victims of elder fraud, including romance scams, and to help apprehend and prosecute individuals who engage in online romance scams targeting older adults.

iii)  *The United States Postal Inspection Service (USPIS)*: A federal law enforcement agency that investigates mail fraud, including romance scams, and provides support and resources to victims to help recover their losses.

iv)   The Financial Crimes Enforcement Network (FinCEN): A bureau of the U.S. Department of the Treasury that provides financial intelligence and analysis to

support law enforcement investigations into financial crimes, including romance
scams. In 2022 five agencies joined an initiative to warn Americans about the danger
of romance scams, including The Commodity Futures Trading Commission, the
Consumer Financial Protection Bureau (CFPB), the Department of Homeland
Security's U.S. Immigration and Customs Enforcement (ICE), the U.S. Postal
Inspection Service, and the U.S. Treasury's Financial Crimes Enforcement Network
(FinCEN) have launched *Dating or Defrauding?*, a national awareness effort to alert
the public to romance scams that target victims largely through dating apps or social
media.

v)    *Department of Justice Money Mule Initiative*, The Department of Justice's (DOJ)
Money Mule Initiative aims to raise awareness and prevent individuals from
unwittingly participating in money laundering schemes, often as part of a larger fraud
operation such as a romance scam, by educating the public and partnering with law
enforcement and financial institutions to detect and prosecute such crimes.

These federal law enforcement initiatives are all dedicated to combating romance scams
and assisting victims through a combination of investigation, enforcement, education and victim
support and resources.

3. **Criminal enterprises operating behind these scams**

Romance scams are typically organized by criminal enterprises, often operating from
countries with less stringent laws and weaker enforcement. These criminal organizations often
consist of individuals working together in a loosely organized network, or they may be highly
structured and hierarchical, with leaders and specialized roles such as recruiters, scammers, and

money launderers (DOJ, 2022). They often have substantial experience in manipulating individuals and they frequently will engage with hundreds of targets to identify one victim.

These criminal organizations can be located in any country, typically with a concentration in regions with high levels of internet usage and a significant presence of dating websites and social media platforms. Countries in West Africa, such as Nigeria and Ghana, have been identified as major sources of romance scams. However, these criminal enterprises often use virtual private networks (VPNs) and other technologies to hide their locations and conceal their activities.

The criminal enterprises will be trained in and deploy a range of techniques in romance scams that are highly sophisticated and involve building deceptive relationships with the victim, creating fake identities and using fake photos and other personal information. Scammers use psychological manipulation, systematically playing on the emotions of the victim to gain their trust and extract money or personal information. They frequently use high-pressure tactics, such as fake emergencies or threats, to force the victim to act quickly and obey them (e.g., to move money).

As noted above, these criminal enterprises frequently target people who are vulnerable and looking for companionship, such as older adults or individuals who are recently widowed or separated from a spouse. They may also target people who are inexperienced with online dating or who may be less skeptical of online relationships. In general, scammers look for individuals who they believe will be susceptible to their false promises of love and affection, making them more likely to fall for the scam.

4.  **Characteristics of a typical romance scam and scam victim**

i)    *Grooming and targeting in romance scams*: Criminals conducting romance scams

use a process called "grooming" to manipulate their victims and build trust.

Grooming involves creating a fake online persona, often using stolen or fake

photos and personal information, and establishing a relationship with the victim

through social media, dating websites, or unsolicited emails. During the grooming

process, the criminal will often listen to the victim, learning about their personal

life, desires, and vulnerabilities, such as loneliness, financial insecurity, or a

recent loss. They then use this information to further their scam, presenting

themselves as a solution to the victim's problems and offering false promises of

love and companionship (see Galdo, Tait & Feldman, 2018).

ii)   *Motivations that make victims vulnerable to romance scams:* Once the victim has

been groomed and a false relationship has been established, the criminal will start

making requests for money, such as asking for a loan or claiming to need money

for a personal emergency, or to move money from one account to another. The

victim may feel a sense of obligation or genuine affection towards the scammer,

making them more likely to comply with the request. In most cases, the criminal

will use psychological manipulation extensively, such as playing on the victim's

emotions or making threats, to pressure the victim into following their

instructions. The scammer may continue to request more money, using the

victim's feelings of guilt and fear to further the crime (see Galdo et al, 2018).

iii)     *Why don't victims see red flags*? The criminal's ability to create a false sense of
trust and connection, combined with the victim's emotional vulnerability, can
make it extremely difficult for the victim to see the warning signs and avoid the
scam. Criminals in romance scams use well-known psychological manipulation
tactics to deceive and control their victims, and can include manipulating
emotions, using flattery and compliments, and creating a sense of urgency or need.
Scammers identify core psychological needs, especially loneliness, fear and
financial insecurity, and then prey on those needs with the relationship. Victims of
romance scams often do not see red flags because they are caught up in the
emotional manipulations of experienced criminals. There are several factors that
make it difficult for victims to realize they are being scammed:

- the online communication format reduces the information that an individual
has about a scammer, which allows the scammer to create a persona that
perfectly matches a possible victim's needs. The fact that there are fewer cues
can paradoxically lead to more intense feelings of attraction and love than in
real life, primarily because the victim can "fill in the blanks" with their
imagination and create a fantasy partner. This is a well known communication
effect, referred to as Hyperpersonal dynamics (Walther et al, 2015).

- the criminal may have spent months or even years building a false relationship
with the victim, making it difficult for the victim to recognize that they are
being scammed.

- the criminal may use a fake persona that is similar to the victim's ideal partner,
creating a false sense of connection and trust.

- the victims may also feel ashamed or embarrassed to admit that they have been scammed and may believe that they are the only ones affected. This can make it difficult for them to see the warning signs and reach out for help.

- scammers may also use threats or intimidation to keep their victims quiet, further compounding their sense of isolation and fear.

iv)    *Money mules as victims*: As the Money Mule Initiative 2021 notes, some money mules are aware that their actions facilitate a fraud, but many others "first interact with fraud schemes as victims and may be unaware that their actions are furthering criminal activity" (U.S. Law Enforcement Targets Fraud Facilitators Doubling Last Years Enforcement OPA Department of Justice). Because these individuals are initially victims in the scam they may have substantial difficulty recognizing red flags, and may also be highly embarrassed, making it difficult for them to reach out for help. Criminals also frequently use threats against the money mule victim that increases their fear and difficulty in reaching out.

v)    *Typical stories and "big asks" used by romance scammers*: As the FTC lays out in its guidance on romance scams and cues to watch out for (FTC "What You Need to Know About Romance Scams), romance scammers use a variety of false stories, including:

- Claims of being stranded in a foreign country and needing money to pay for travel expenses, medical bills, or unexpected emergencies.

- Requests for money to pay for visas, legal fees, or other costs associated with relocating to be with the victim.

- Stories of being a member of the military or working overseas and needing money to purchase equipment or resolve personal problems.

- Claims of winning a large sum of money, but needing help with taxes, legal fees, or other costs to access the funds.

The "big ask" by the scammer usually occurs after they have spent time communicating with the victim and building a false relationship. The scammer may ask the victim for a large sum of money or sensitive personal information, such as bank account numbers or social security numbers. In some cases, the scammer may also ask the victim to participate in a money mule scheme, where the victim is used to transfer money from one account to another, often across international borders.

The fake emergency situations and the "big ask" are designed to create a sense of urgency and make the victim feel that they have a personal obligation to help the scammer. The scammer may also use emotional manipulation and fear tactics to convince the victim that failure to comply will result in negative consequences, such as loss of the relationship or even physical harm. Overall, the goal of these tactics is to convince the victim to send money or provide sensitive information, furthering the scam and allowing the criminal to profit from their crime.

vi)  *Risk of revictimization*: Victims of romance scams are at substantial risk of re-victimization, which is when they are targeted by another scam or crime after they have already fallen victim to one. This can occur because the information that the victim provided during the initial scam is often used to perpetuate future scams. Some of the risks of re-victimization for victims of romance scams include:

**Identity theft**: The victim's personal information, such as their full name, date of birth, social security number, and bank account details, may be used to commit identity theft.

**Phishing scams**: The victim may receive emails, phone calls, or text messages from someone posing as a bank, government agency, or other trustworthy organization, asking for personal information.

**Investment scams**: The victim may be targeted by another scammer posing as a financial advisor, offering investment opportunities that are too good to be true.

**Lottery scams**: The victim may be contacted and told that they have won a large sum of money, but are required to pay a fee to claim the prize.

**Charity scams**: The victim may be targeted by scammers posing as charity organizations, asking for donations to support a fake cause.

Re-victimization can have serious consequences for victims, including financial losses, emotional distress, and loss of personal information. It can also lead to a decrease in trust and increase in fear and anxiety, making it difficult for the victim to engage in future relationships or financial transactions.

vii) *Charging victims in romance scams:* In some cases, victims of romance scams may be charged in connection with their role in the scam. This can occur if the victim knowingly participated in illegal activities, such as money laundering, or if they willingly transferred money or other assets to the scammer. For example, in some cases, victims may be asked to open bank accounts or use their own accounts to transfer funds for the scammer. In these cases, law enforcement may view the victim as an accomplice to the crime and may charge them with related offenses, such as money laundering or fraud. For example, in 2021, an 81 year old victim of a romance scam plead guilty to money laundering after she was recruited as a money mule by a Nigerian romance scammer. The woman had transferred large sums of money on behalf of the scammer, despite the fact that for several years "bank employees, local police officers, and federal agents told me that my love was a scam and that I needed to stop or I could go to jail" (FBI 2021).

This victim's inability to detect red flags, despite warnings by bank employees, police and federal agents, highlights how difficult it is for victims of romance scams to detect red flags indicating that the relationship is not real or that it may be related to criminal activity. It is important to note that many victims of romance scams are unaware that they are participating in illegal activities. Instead, the focus most frequently is on investigating and prosecuting the individuals behind the scam. As the Justice Department noted in its Money Mule Initiative Report, many mules initially victimized in a romance scam *"first*

*interact with fraud schemes as victims and may be unaware that their actions are*
*furthering criminal activity"* (DOJ, 2021).

Indeed, many organizations in both the US and in Europe have now conducted studies of romance scams and observed an increasing trend in romance scams of victims becoming unwitting money mules. As the Better Business Bureau (2019) "*Fall in Love – Go to Jail*" report notes, there has been a surge in romance scam victims becoming unwitting money mules. The problem is massive, with an estimated 20-30% of victims in romance scams being used as money mules in 2019, a number that has almost certainly gone up with the dramatic rise of romance scams during the COVID19 lockdowns.

When romance scam victims do not have substantial financial resources they are more likely to be targeted as mules by the criminal organization by manipulating them into money mules who receive money or goods purchased with stolen credit cards and often re-send them out of the country. They effectively are aiding and abetting a variety of frauds, often without any awareness of the crime, making it much harder for law enforcement to recognize the scope of the fraud or identify the real perpetrators. Fraudsters who target women often claim to be involved in businesses overseas and request financial help to handle emergency "business issues" that might get in the way of the couple having a prosperous life together. These scenarios make requests for help appear very believable to victims. Fraudsters targeting male victims often claim to be a young student or teacher in another country who needs money for travel to the U.S. or other destinations.

## PART II

### 1. Assessment of Myrna Ortiz victimization and role in a romance scam

Counsel requested that I consider the characteristics of the Ortiz case to examine how and why Ortiz became a victim in a romance scam. In my expert opinion, detailed below, the Ortiz case fits all the criteria of a romance scam, and her psychological profile and my interview with her suggest that she was particularly vulnerable to becoming a romance scam victim.

The key criteria of a romance scam, as described above, includes the criminal using a false identity, building a relationship, requests for assistance with money, no physical relationship, and disappearance. The Ortiz case fits all of these criteria. The criminal used a false identity, spent substantial time building a relationship with Ortiz through extensive text exchanges professing love and affirmation, included requests to help with money, did not involve a physical relationship, and finally complete disappearance.

In reviewing Ortiz's psychological report provided by Dr. Blair, it is clear that Ortiz suffered from several key psychological issues that made her particularly vulnerable to a romance scam. At the time that the romance scam began she was socially isolated, lonely, depressed and anxious. The criminal targeting her in this romance scam offered love and affirmation in an online format that met Ortiz's needs for affection but that also did not require her to engage in social interaction outside the text-messaging medium.

My own interview with Ortiz confirmed my assessment from the psychological profile. She confirmed that she was lonely and that the messages she received from the scammer were psychologically rewarding and potent to her. She quickly developed an intense, intimate relationship, consistent with other work on hyperpersonal dynamics that take place in text-based channels (as noted above). It was clear that her relationship with the scammer was very positive and also fantastical (e.g., that they would start a life together based on their text exchanges). She indicated that the scammer was scheduled to come visit physically, but at the last minute had to cancel his flight, a common tactic in romance scams. This technique further isolated Ortiz as she stopped discussing the relationship with her family given her embarrassment that he never physically visited.

In sum, the relationship was clearly a romance scam, fitting the key criteria, and Ortiz had multiple psychological and social characteristics that made her particularly vulnerable to being targeted and victimized.

### 2. Assessment of Myrna Ortiz's ongoing role in the romance scam

Counsel requested that I consider Ortiz's ongoing role in the romance scam, whether she remained a victim, and whether she should have detected red flags indicating that this was a romance scam. In my expert opinion, detailed below, Ortiz remained a victim throughout her involvement in the romance scam. Ortiz's inability to detect red flags in the romance scam is reasonable given 1) the criminal's emotional and psychological manipulation of Ortiz and Ortiz's unique 2) psychological vulnerabilities and 3) cognitive deficits. Based on my analysis, Ortiz was most likely unaware that she was engaging in criminal activity and that she believed her actions to be necessary to maintain her relationship with the scammer.

1. Emotional and psychological manipulation: the criminal organization targeting Ortiz used sophisticated emotional manipulation techniques common to romance scams, including:

   a. *Manipulating her emotions* by providing unconditional affection repeatedly through text messaging, manipulating Ortiz's need for affirmation given her loneliness and desire for a romantic relationship.

   b. *Creating a sense of urgency* by claiming to be in distress, which increased the pressure on Ortiz to transfer assets and prevented Ortiz from taking the time to consider the situation more carefully.

   c. *Building a rapport* over an extended period with Ortiz, sending messages and emails, and even making plans to meet in person, to increase Ortiz's sense of trust and emotional attachment

   d. *Isolating* Ortiz from her friends and family in order to control the relationship and reduce the chances of the victim seeking outside help or advice.

   e. *Issued threats* to control Ortiz. In one salient and powerful example, when Ortiz considered leaving the relationship she was contacted by the scammer's "friend" who let her know the scammer was in the hospital after attempting suicide. The implied threat here was that if Ortiz stopped the relationship the scammer would kill themselves.

   The use of these tactics by the scammer substantially impaired Ortiz's ability to detect red flags or recognize the signs of emotional manipulation.

2. As the psychological report by Dr. Blair makes clear, Ortiz suffers from anxiety and depression and is socially isolated. Her loneliness, anxiety and depression make her extremely vulnerable to the emotional manipulation of romance scammers. Her

psychological needs, which were being met by the scammer to some degree, substantially interfered with her ability to assess red flags or recognize the problematic aspects of the relationship, including what the scammer was asking her to do for "him." Further, her social isolation made it difficult for her to discuss the relationship with other people, making it even more difficult for her to identify red flags within the relationship.

3. The report by Dr. Blair also indicates that Ortiz has important cognitive deficits that made it difficult for Ortiz to consider information within the romance scam that may have raised a red flag. In particular, the results from the WAIS-IV that assessed her intellectual functioning revealed an IQ of 75, placing her within the borderline range of intellectual functioning. The test also revealed specific deficits that bear on her ability to detect red flags within an ongoing romance scam. In particular, the report indicates that Ortiz is grossly deficient in verbal comprehension, including the capacity to distinguish between essential and inessential information. Ortiz also displayed a perceptual deficit suggesting she has difficulty visually assessing information and understanding the relationships between information.  These cognitive deficits are, in my view, highly likely to have significantly impaired Ortiz's ability to process information and make reasonable decisions, especially while under the substantial emotional manipulation from the romance scam.

## Sources

Better Business Bureau (2020). St. Louis Consumer Task Force Warns Public about Romance
Scams during Covid 19.

Better Business Bureau (2019) *Fall in Love – Go to Jail*. Available here:
https://www.bbb.org/content/dam/0734-st-louis/romance-studies/fall-in-love-go-to-jail-
bbb-report-on-how-some-romance-fraud-victims-become-money-mules-final-02-09-
2019.pdf

DOJ (2021). U.S. Law Enforcement Targets Fraud Facilitators, Doubling Last Year's
Enforcement. Available : https://www.justice.gov/opa/pr/us-law-enforcement-targets-
fraud-facilitators-doubling-last-year-s-enforcement

DOJ (2022). Top Money Launderer For Ghana-Based Criminal Enterprise Sentenced To Nine
Years. Available: https://www.justice.gov/usao-sdny/pr/top-money-launderer-ghana-
based-criminal-enterprise-sentenced-nine-years

FBI (2021). Victim of Romance Scam Who Became Money Mule Tells Story. Available at:
https://www.fbi.gov/video-repository/sl-money-mule-psa-110221.mp4/view

FTC (2022)  What You Need To Know About Romance Scams FTC Consumer Information.
Available: https://consumer.ftc.gov/articles/what-know-about-romance-scams

FTC (2022). Reports of romance scams hit record highs in 2021. Available:
https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/02/reports-
romance-scams-hit-record-highs-2021

Galdo, M. C., Tait, M. E., & Feldman, L. E. (2018). Money mules: Stopping older adults and
others from participating in international crime schemes. *Dep't of Just. J. Fed. L. &
Prac.*, 66, 95.

Walther, J. B., Van Der Heide, B., Ramirez Jr, A., Burgoon, J. K., & Peña, J. (2015). Interpersonal and

    hyperpersonal dimensions of computer-mediated communication. *The handbook of the*

    *psychology of communication technology*, 1-22.

Whitty, M.T. (2015) Anatomy of the online dating romance scam. Security Journal, 28 (4). pp.

    443-455.

Whitty, M.T. (2018). Do You Love Me? Psychological Characteristics of Romance Scam

    Victims. *Cyberpsychology, Behavior, and Social Networking,* pp. 105-109.

    http://doi.org/10.1089/cyber.2016.0729

Exhibit B

Office of the Inspector General
Office of Investigations
Social Security Administration

## REPORT OF INVESTIGATION

**TITLE OF CASE:** Myrna Ortiz

**CASE NUMBER:** PHL2000038Z

**PROGRAM CATEGORY:** 630 - TITLE II - RSI

**PERIOD COVERED:** 10/09/2020 **TO:** 10/09/2020

**RELATED CASE NUMBERS:** N/A

**REPORTED BY:** SHON SAIN

**FIELD DIVISION:** PHILADELPHIA

**OFFICE:** PHILADELPHIA

**STATUS OF CASE:** STATUS REPORT

**SYNOPSIS:**

The case continues in the EDPA.

This report contains sensitive law enforcement material and is the property of the Social Security Administration, Office of the Inspector General (SSA OIG). This report is FOR OFFICIAL USE ONLY, including, but not limited to, its use in the claims adjudication process. It may not be copied or reproduced without written permission from the SSA OIG; however, for purposes of claims adjudication by SSA, including the DDS and the ODAR, it may be copied and incorporated into official claims files. Disclosure to unauthorized persons is strictly prohibited and may subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552 and 552a.

On October 7, 2020, a search warrant application for the residence of Myrna ORTIZ was approved in the EDPA.

On October 9, 2020, agents from SSA-OIG, ICE and the Philadelphia Police Department executed a search warrant at the residence without incident. ORTIZ was served with a target letter.

### ALLEGATION OR REFERENCE TO MOST RECENT REPORT:

Reference is made to all previous reports, last dated October 3, 2020 regarding this investigation.

### INVESTIGATIVE ACTIVITY:

On October 7, 2020, an application for a search warrant was approved by a U.S. Magistrate Judge in the EDPA to search 4032 L. Street, Philadelphia, PA.

On October 9, 2020, SSA-OIG agents SA E. Smith, SA T. Bray, SA N. Reichard, ASAC J. McLeod, SA D. Lauer and myself executed the search warrant with an agent from ICE and officers from the Philadelphia Police Department.

Agents briefed prior to executing the search warrant and arrived at the residence at approximately 8:15 a.m. Upon arriving at the front door of the residence, SA E. Smith knocked on the door, announced the police presence and announced that we had a search warrant. This occurred multiple times. Shortly thereafter, a woman, later identified as Myrna Ortiz Sr. (hereinafter Ms. Ortiz), opened the door. Ms. Ortiz was escorted out of the residence for safety purposes. Agents then completed a safety clearance of the residence. During the safety clearing of the residence an individual named Jimmy Cottman was encountered and taken outside the residence until the residence was cleared.

Once the residence was cleared, I provided a copy of the signed search warrant and attachment B to Myrna Ortiz Sr. I explained the warrant and the reason for our presence in the home. I asked Ms. Ortiz where her daughter Myrna ORTIZ (Target) was and was told she was currently at work. At this time, I asked Ms. Ortiz to contact her daughter to ask her to come to the residence. Ms. Ortiz provided her cell phone to SA Smith. SA Smith spoke with ORTIZ and informed me that ORTIZ agreed to leave work to come to the residence.

SA Smith then completed a video recorded walkthrough of the residence. After the walkthrough, the

This report contains sensitive law enforcement material and is the property of the Social Security Administration, Office of the Inspector General (SSA OIG). This report is FOR OFFICIAL USE ONLY, including, but not limited to, its use in the claims adjudication process. It may not be copied or reproduced without written permission from the SSA OIG; however, for purposes of claims adjudication by SSA, including the DDS and the ODAR, it may be copied and incorporated into official claims files. Disclosure to unauthorized persons is strictly prohibited and may subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552 and 552a.

USA_000045

rooms in the home were labeled and the search was initiated. I spoke with Ms. Ortiz, who advised she was the owner of the property. She advised that her and her daughter Myrna ORTIZ had the same name, except her daughter was known as Myrna M. ORTIZ Jr. Ms. Ortiz advised that she and her boyfriend, Jimmy Cottman, slept in the master bedroom. Ms. Ortiz stated that Myrna ORTIZ's room was upstairs and straight ahead towards the end of the hallway. Ms. Ortiz also advised her son Juan Ortiz lived in the basement. Juan Ortiz arrived to the residence while I was speaking to Ms. Ortiz. Juan Ortiz confirmed that Myrna ORTIZ resided in the upstairs bedroom previously described by Ms. Ortiz. Ms. Ortiz also advised her daughter Hennessey resided in one of the upstairs rooms. Hennessey is ORTIZ's daughter.

I began searching the Kitchen and then the Dining Room. In the Dining Room, I located a small grocery bag full of delivered mail. The bag contained mostly mail for Ms. Ortiz, but I identified two letters addressed to Myrna ORTIZ from Santander Bank. These two envelopes were collected as evidence. I asked Ms. Ortiz where she did her banking. Ms. Ortiz advised she only has a bank account at PNC Bank. She denied having a bank account at Santander Bank or having any knowledge of the account. I also asked her if she knew anything about her daughter receiving Social Security deposits into her banking account. Ms. Ortiz advised she did not know anything about it.

Myrna ORTIZ arrived at the residence. She sat down at the dining room table with SA Smith and myself. I identified myself as a Federal Agent with SSA and explained why we were there. I informed ORTIZ that she was not under arrest and that once the search was completed, we would leave. I explained to ORTIZ that we wanted to speak with her about the Santander Bank account where she received Social Security deposits. I thoroughly explained to ORTIZ again that she was not under arrest and she did not have to answer any of my questions. ORTIZ agreed to speak with me regarding the matter.

ORTIZ advised she was an employee of the Philadelphia Corporation for Aging. ORTIZ confirmed the other individuals residing in the home as her mother, Cottman, her daughter Hennessey and her brother Juan Ortiz. ORTIZ confirmed her bedroom was upstairs and straight down at the end of the hallway, as described by Ms. Ortiz and Juan Ortiz. ORTIZ confirmed that no one else sleeps in her room and she has full control of the room.

I asked ORTIZ to tell me about the Santander Bank account. ORTIZ advised she believed the account was opened in 2018. I asked if she had a debit card for the account and she answered in the affirmative. She opened her purse, removed her wallet and provided me with a Santander Bank debit card ending in 8371. I asked ORTIZ if her employment check was deposited into this account. She advised her employment check does not go into this account and advised she has a PNC Bank account. I asked how the Santander Bank account was opened. ORTIZ advised she opened the account online after meeting a guy on the internet. I asked her to elaborate. ORTIZ advised she met a guy named "Christian DASILVA" on Match.com and he asked her to open the bank account. ORTIZ stated DASILVA told her he needed her to open the account to help him after he was arrested.

This report contains sensitive law enforcement material and is the property of the Social Security Administration, Office of the Inspector General (SSA OIG). This report is FOR OFFICIAL USE ONLY, including, but not limited to, its use in the claims adjudication process. It may not be copied or reproduced without written permission from the SSA OIG; however, for purposes of claims adjudication by SSA, including the DDS and the ODAR, it may be copied and incorporated into official claims files. Disclosure to unauthorized persons is strictly prohibited and may subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552 and 552a.

USA_000046

According to ORTIZ, DASILVA lives in the Phillipines and that she believed the deposits going into the account were funds he needed to pay fines associated with his arrest. ORTIZ advised she has never met DASILVA in person. She has only communicated with him via email, phone and text.

I asked ORTIZ if she had her cellular phone in her possession. She provided the cellular phone to me and advised it was an IPhone 11. I asked ORTIZ if she also communicated with DASILVA using a computer. ORTIZ advised all communication with DASILVA occurred using her cellular phone. I explained to ORTIZ that the search warrant allowed us to seize the phone. I asked if she would sign a consent form for the government to search the phone for communications with DASILVA. ORTIZ agreed and signed a consent form for the IPhone. ORTIZ provided the passcode for the phone and identified DASILVA's cellular number as being 786-864-6143 and an email of Christian.Dasilva@gmail.com. ORTIZ advised that she communicated "a lot" via text messages with DASILVA.

Going back to the Santander Bank account, ORTIZ advised that after opening the account, deposits would then be placed into the account. She stated that after each deposit, DASILVA contacted her to notify her that the funds were in the account. ORTIZ advised she would then go to a retail store such as Rite Aid or Walgreens to purchase gift cards. ORTIZ advised she would email the gift card information to DASILVA. I asked how DASILVA knew the funds were in the account. ORTIZ advised she provided the account information to him, which allowed him to access the account online. ORTIZ stated she also had online access to the account. ORTIZ advised she used the Santander Bank debit card to make the purchases of the gift cards.

I asked ORTIZ if she was given any money for her part in the scheme. ORTIZ advised she received around $500 per month. ORTIZ advised DASILVA withdrew funds from the account online and left money in the account for her as payment for her role in the scheme. ORTIZ advised she used the debit card to access these funds for personal expenses such as bills and purchases. After the search was completed, I asked ORTIZ to clarify if she received $500 monthly or for each deposit made into the account. ORTIZ advised sometimes she received $500 per deposit and sometimes it was $500 monthly. I asked ORTIZ how much money she believed she received for her role in the scheme. ORTIZ was not sure, but thought it could be somewhere between $10 to $20 thousand dollars.

I asked ORTIZ if she knew what she was doing was wrong. ORTIZ advised she began suspecting something was wrong in early 2020 when she noticed the deposits into account were in the names of other individuals (not DASILVA). I asked why she participated in the scheme. ORTIZ advised she trusted DASILVA, but when she asked him about the deposits, he would not answer her. I asked ORTIZ why she had not closed the account. ORTIZ advised she told DASILVA she was closing the account a few months ago, but just hadn't done it. ORTIZ acknowledged knowing what she did was wrong. I asked if she had any other accounts where she conducted the same type of activity. ORTIZ advised she also had a Citizens Bank and Citbank account where she and DASILVA participated in the same activity. ORTIZ denied having any of the debit cards for these accounts and

This report contains sensitive law enforcement material and is the property of the Social Security Administration, Office of the Inspector General (SSA OIG). This report is FOR OFFICIAL USE ONLY, including, but not limited to, its use in the claims adjudication process. It may not be copied or reproduced without written permission from the SSA OIG; however, for purposes of claims adjudication by SSA, including the DDS and the ODAR, it may be copied and incorporated into official claims files. Disclosure to unauthorized persons is strictly prohibited and may subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552 and 552a.

USA_000047

stated she "cut up" the cards.

Ortiz confirmed her daughter's unemployment checks were also deposited into the Santander Bank account.

A search of ORTIZ's room revealed at least eighty-seven (87) gift cards such as Visa, Macy's, Sach's Fifth Avenue, Green Dot Bank, Old Navy, Apple, Walmart, Victoria Secret Target and Burlington Coat Factory. A significant number of these gift cards were wrapped with the corresponding purchase receipt from whatever retail store the cards were purchased from. A large number of these gift cards were located underneath the mattress in ORTIZ's bedroom, inside of a dresser drawer and on a bookcase inside her bedroom. A large amount of mail addressed to ORTIZ, as well as mail from other financial institutions such as Discover, Bank of America, Capital One and Ally bank were found underneath the mattress. A mobile tablet was also found in the bookcase next to a stack of Green Dot Bank Visa gift cards. Several checkbooks were also found in the bedroom. All of these items were seized as evidence.

A copy of the items seized during the search was given to ORTIZ along with a copy of the warrant and the attachment B. A Target Letter was given to ORTIZ with instructions. ORTIZ provided a written statement attesting to her involvement in this scheme. A final walkthrough video was completed by SA Smith upon exiting the residence.

## SUBJECT(S) AND/OR DEFENDANT(S):

Subject: Myrna Ortiz Gender: FEMALE DOB: 07/28/1978 SSN: 179606014 Address: 4032 L. Street Philadelphia, PA

## JUDICIAL ACTION:

N/A

## DISPOSITION OF EVIDENCE, GRAND JURY MATERIAL, AND/OR PERSONAL PROPERTY:

This report contains sensitive law enforcement material and is the property of the Social Security Administration, Office of the Inspector General (SSA OIG). This report is FOR OFFICIAL USE ONLY, including, but not limited to, its use in the claims adjudication process. It may not be copied or reproduced without written permission from the SSA OIG; however, for purposes of claims adjudication by SSA, including the DDS and the ODAR, it may be copied and incorporated into official claims files. Disclosure to unauthorized persons is strictly prohibited and may subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552 and 552a.

USA_000048

All of the evidence in this case was secured in the Philadelphia Field Office evidence vault on October 9, 2020.

**MONETARY ACHIEVEMENT:**

N/A

**SUBMITTED BY:** SHON SAIN     10/09/2020

**APPROVED BY:** JOHN MCLEOD     10/13/2020

This report contains sensitive law enforcement material and is the property of the Social Security Administration, Office of the Inspector General (SSA OIG). This report is FOR OFFICIAL USE ONLY, including, but not limited to, its use in the claims adjudication process. It may not be copied or reproduced without written permission from the SSA OIG; however, for purposes of claims adjudication by SSA, including the DDS and the ODAR, it may be copied and incorporated into official claims files. Disclosure to unauthorized persons is strictly prohibited and may subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552 and 552a.

USA_000049

# SOCIAL SECURITY
## Office of the Inspector General

STATEMENT OF _Myrna Ortiz_     PAGE 1 OF ____

"I, _Myrna Ortiz_ , hereby make the following free and voluntary

sworn statement to _SA Shawn Sain / SA Ervin Smith_ who has identified him/herself

to me as a Special Agent with the Office of Inspector General, Social Security Administration."

" I met a man named Christian Dashiri and after talking/texting

for a few months he asked if I would open an account to help

receive his payments money. I opened the Santander account and

money started coming in. He asked me to withdraw money and buy

him vanilla visa cards in the amounts he requested. After taking

pics of the cards and receipt, I would email them through my

personal account. When I started asking questions about these

deposits, he would say that they were his friends helping him. He

used these payments ___ to pay fines he would get after being

arrested. I understand what I did was wrong and take full

responsibility for what I've done. I now understand that I "

State of: _____ Date: _____

County of: _____ Location: _____

This report contains sensitive law enforcement material and is the property of the Social Security Administration, Office of Inspector General (SSA OIG). It may not be copied or reproduced without written permission from the SSA OIG. This report is **FOR OFFICIAL USE ONLY**, and its disclosure to unauthorized persons is strictly prohibited and may subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

FORM OI-16A (Revised 3/28/2002)

# SOCIAL SECURITY
## Office of the Inspector General

STATEMENT OF _____ PAGE _____ OF _____

was being scammed into doing these things because I thought
he loved me and I loved him. ~~strikethrough~~
~~crossed out~~ I stopped communicating with him and to tell him I
couldn't do this anymore. I don't want to go to jail, please
I'll pay fines and return money.

_mno_
_10/9/2020_

This report contains sensitive law enforcement material and is the property of the Social Security Administration, Office of the Inspector General (SSA OIG). It may not be copied or reproduced without written permission from the SSA OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and may subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

FORM OI-16D (Revised 3/28/2002)

# SOCIAL SECURITY
## Office of the Inspector General

STATEMENT OF _____     PAGE _____ OF _____

_____

_____

_____

_____

_____

_____

_____

I have read this statement, consisting of this and _____ other page(s); and it is true, accurate, and complete to the best of my knowledge and belief. I have initialed each page, where necessary, and have been given an opportunity to make any corrections or additions. I have initialed each line where a correction has been made.

_Myrna M Ort_
SIGNATURE OF PERSON MAKING STATEMENT

Subscribed and sworn to before me this the _9_ day of _October_, 20_20_, at _10:20 a. m_

Special Agent
Office of Investigations
Office of the Inspector General
Social Security Administration

Witness(es): _____

This report contains sensitive law enforcement material and is the property of the Social Security Administration, Office of the Inspector General (SSA OIG). It may not be copied or reproduced without written permission from the SSA OIG. This report is **FOR OFFICIAL USE ONLY**, and its disclosure to unauthorized persons is strictly prohibited and may subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

FORM OI-16E (Revised 3/28/2002)